**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | |
|---|---|
| **MARIA PHILLPOTTS**<br>8124 Glen Gary Road<br>Parkville, Maryland 21234<br>*Resident of Baltimore County* | Civil Action No.: |
| Plaintiff, | Collective/Class Action Claim |
| ***Individually and on Behalf of All***<br>***Similarly Situated Employees*** | |
| v. | <u>Jury Trial Requested</u> |
| **SEVERN MANAGEMENT COMPANY,**<br>**LLC**<br>410 Severn Avenue, Suite A103<br>Annapolis, MD 21403 | |
| Serve:  Arthur W. Edwards, Jr.<br>        Attn: Chief Financial Officer<br>        410 Severn Avenue, Suite B-413<br>        Annapolis MD 21403 | |
| Defendant. | |

<u>**COMPLAINT FOR WAGES OWED**</u>

MARIA PHILLPOTTS, Plaintiff, by and through her undersigned counsel and The Law

Offices of Peter T. Nicholl, hereby submits her Complaint against SEVERN MANAGEMENT

COMPANY, LLC, Defendant, to recover unpaid wages, liquidated damages, interest, reasonable

attorneys' fees and costs under Section 16(b) of the Federal Fair Labor Standards Act of 1938, as

amended, 29 U.S.C. §§ 201, *et seq.* (hereinafter, "FLSA"); unpaid wages, liquidated damages,

interest, reasonable attorneys' fees and costs under Maryland Wage and Hour Law, Md. Code

Ann., Lab. & Empl. §§ 3-401, *et seq.* (hereinafter, "MWHL"); and unpaid wages, interest, treble

damages, reasonable attorneys' fees and costs under the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl., §§ 3-501, *et seq*. (hereinafter, "MWPCL"), and in support thereof, states as follows:

## INTRODUCTION AND BACKGROUND

Defendant is in the business of property management. Defendant manages properties throughout Maryland, Delaware and Virginia. Defendant owns or operates approximately fifty-six (56) properties, ranging from typical apartment buildings to senior living facilities.

Defendant hired Plaintiff and others similarly situated to work as property managers. Their duties consisted of handling the day to day functions of Defendant's properties. One of these properties is Fairspring Apartments (hereinafter, "Fairspring"). Fairspring caters specifically to the elderly. Plaintiff was staffed at Fairspring for the duration of her employment.

Plaintiff was classified as an hourly employee. She was paid at a rate of twenty dollars ($20.00) per hour. She was tasked with handling a variety of resident issues. These issues centered on resolving disputes between the residents. Plaintiff was also in charge of conducting meetings with prospective tenants. Showing prospective tenants model apartments was another one of her regular tasks. Plaintiff had to perform inspections as well. She regularly checked the building for leaks, floods and other damage. Plaintiff also had to ensure that each unit was properly maintained.

The completion of all of these tasks often resulted in extending Plaintiff's workday. Resolving disputes between residents often took longer than anticipated. She would also have to show as many as six (6) to seven (7) model apartments a day. Having to address the various maintenance issues also caused Plaintiff to work hours outside of her schedule. The combination of these duties resulted in Plaintiff having to work overtime consistently.

Plaintiff was responsible for other assignments as well. She had to file, compile and organize various documents. These tasks were part of Defendant's recertification process. Each year, Plaintiff had to schedule face to face interviews with all residents in order to submit applications on their behalf. This was to ensure that they could continue living at Fairspring. Plaintiff had to gather each resident's Department of Social Services ("DSS") information and pension paperwork. She had to collect their bank statements and related documents. Plaintiff was also tasked with calling outside agencies that were responsible for verifying the information submitted. Plaintiff had to follow these procedures for each resident. These steps had to be completed before a tenant could renew his or her lease. Completing these steps often required Plaintiff to work hours outside of her schedule.

Because most of the residents were elderly, working with them could be challenging. Plaintiff often encountered residents that were combative. These encounters forced Plaintiff to be extremely patient. Therefore, obtaining their recertification documents was time-consuming. These conditions contributed substantially to the overtime Plaintiff worked.

Understaffing also contributed to Plaintiff working overtime. When her employment began, an assistant property manager ("assistant") was staffed at the facility. The assistant helped Plaintiff with her duties. However, only about a month into Plaintiff's tenure, the assistant's employment ended. Plaintiff became the sole property manager on staff. She had to perform all of her previously shared responsibilities without any assistance. Plaintiff became accountable for the state of the entire property with absolutely no help. Due to the lack of help, Plaintiff's workload increased immensely. Completing all of her assigned tasks became extremely difficult.

Understaffing also resulted in Plaintiff having to regularly remain on call. There were constant issues related to the property's fire alarm and other utilities. Many of these systems were

of poor quality. Defendant failed to provide the resources to replace these systems. Defendant only provided temporary repairs, allowing the problems to recur. When these problems arose, maintenance personnel were the primary point of contact. However, due to understaffing, maintenance personnel were not always available. Since Plaintiff was the next point of contact, she had to consistently deal with maintenance issues. Plaintiff was constantly flooded with calls and e-mails from residents regarding these concerns. Plaintiff had to work hours outside of her schedule to respond to all of the complaints. This included working both before and after her regularly scheduled shifts, in addition to on the weekends. Working these extra hours caused Plaintiff to work overtime constantly.

Although Plaintiff consistently worked overtime, she was not paid for her extra work. It was Defendant's policy to not compensate its employees for overtime. This was regardless of the fact that Plaintiff was required to work additional hours. Working these excessive hours did not impact the manner in which Plaintiff was paid. She was not compensated for any hours she worked over forty (40) in a week. She was never compensated at a rate of "time and a half" her regular rate of pay.

Defendant was well aware of the overtime hours worked by Plaintiff. Plaintiff was required to "clock in" and "clock out" on timekeeping software. She was also regularly required to submit timesheets to her employer. The timesheets clearly illustrate that Plaintiff consistently worked forty (40) hours or more each week. The timesheets show that it was routine for Plaintiff to work approximately fifty (50) hours each week. However, one of Defendant's agents frequently doctored these timesheets. It was said agent's regular practice to alter Plaintiff' timesheets to reflect that she worked forty (40) hours or less. This was completed for the sole purpose of cheating Plaintiff out of the overtime compensation she rightfully earned.

Through its unlawful practices, Defendant evaded the payment of wages owed to Plaintiff and other similarly situated employees. This directly contravenes the standards set forth by the FLSA, MWHL and the MWPCL. At all times, Plaintiff and others similarly situated worked as hourly employees. There is no basis for Plaintiff and others similarly situated to have not been compensated for the overtime hours they worked. Plaintiff, along with other employees at her location, made consistent complaints to management regarding Defendant's unfair practices.[1] They consistently complained about the overtime wages missing from their paychecks. Their complaints did not achieve any results.

## THE PARTIES

1.      Plaintiff Maria Phillpotts (hereinafter, "Plaintiff") is an adult resident of Baltimore County, Maryland.

2.      Severn Management Company, LLC (hereinafter, "Defendant") is an incorporated for-profit business.[2] Defendant's business centers on property management.

3.      Defendant's principal office is in Anne Arundel County, Maryland.

4.      Defendant owns and operates properties in Maryland, Virginia and Delaware.

5.      Defendant also provides investment and construction services.

6.      Due to the nature of its business, Defendant is subject to the FLSA, MWHL and the MWPCL due to the amount in revenues generated. Defendant's business meets the definition of a retail or service establishment.

---

[1] Investigation is currently being performed regarding the scope of Defendant's unlawful practices. This includes all of the positions that will encompass the potential class. Maintenance staff employed with Defendant are also paid hourly. Certain staff members have alleged that they were subject to the same violations referenced within this Complaint. Upon information and belief, Defendant has also refused to pay these employees correctly for all overtime hours worked. It is also Plaintiff's understanding that members of Defendant's maintenance staff were subject to retaliation as a result of the above captioned lawsuit.

[2] Hereinafter, any reference to Defendant shall include its corporate officers and all those empowered to act as agents of the corporation, either explicitly or implicitly, or who are designated as agents under the doctrine of apparent agency. To the extent individual agents are responsible for any actions alleged in this Complaint, they are hereby incorporated by reference within the term "Defendant."

7. Defendant is subject to the FLSA, MWHL and the MWPCL due to the amount in revenues generated. Defendant's annual dollar volume of business exceeds five hundred thousand dollars ($500,000.00).

8. At all times relevant to this Complaint, Plaintiff engaged in interstate commerce based on the duties she performed for Defendant.

9. Plaintiff worked for Defendant who, at all times throughout Plaintiff's employment, fell within the definition of the term "employer" under the FLSA, 29 U.S.C. § 203(d), MWHL, § 3-401(b) and the MWPCL, § 3-501(b).

10. At all times relevant, Plaintiff and other similarly situated employees worked as non-exempt employees for Defendant.

11. From approximately November 1, 2015 until September 1, 2016, Plaintiff was employed with Defendant.

12. Plaintiff typically worked Monday through Friday.

13. At all times relevant to this Complaint, Defendant controlled the administration of its business and set employee schedules, including those of Plaintiff and others similarly situated.

14. Defendant's agents were, individually and together, actively engaged in the management and direction of Plaintiff and other similarly situated employees.

15. Defendant possessed and exercised authority to determine the hours worked by Plaintiff and others similarly situated.

16. Defendant had the authority to control Plaintiff's tasks and the tasks of others similarly situated.

17. Defendant had and exercised the power and authority to change the course of Plaintiff's and other similarly situated employees' duties.

18.     Plaintiff and members of the putative class recognized Defendant's authority and obeyed Defendant's instructions.

19.     Defendant made all decisions relating to Plaintiff and other similarly situated employees' rates and methods of pay.

## JURISDICTION AND VENUE

20.     Original jurisdiction in this Honorable Court is expressly provided by the FLSA, 29 U.S.C. § 207, *et seq*.  This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, as this matter presents a federal question.

21.     Discretionary supplemental jurisdiction of Plaintiff's Maryland state law claims is provided by 28 U.S.C. § 1367(a); the state law claims form part of the same case or controversy and derive from a common nucleus of operative facts, on which Plaintiff's federal claims are based.

22.     Furthermore, no reasons exist that would force this Honorable Court to decline jurisdiction; the state law claims (i) do not raise novel or complex issues of state law, (ii) do not substantially predominate the claims over which this Honorable Court has original jurisdiction and (iii) no exceptional circumstances exist that would constitute a compelling reason for declining jurisdiction, thereby satisfying 28 U.S.C. 1367(c).

23.     Pursuant to 28 U.S.C. § 1391(b), venue is appropriate; the unlawful acts central to this matter occurred primarily within the State of Maryland.  Additionally, Plaintiff is a resident of the State of Maryland and has been for the entirety of the relevant period.

24.     This Honorable Court has personal jurisdiction over Defendant; Defendant is a incorporated under the laws of Maryland and conducts sufficient business within the forum state so as to constitute a submission to its laws.

**FACTUAL ALLEGATIONS FOR ALL CLAIMS**

25.     Defendant is a collection of property management, acquisition, rental and construction companies.

26.     Defendant is headquartered in Annapolis, Maryland.

27.     Defendant serves clients in Maryland, Delaware and Virginia.

28.     Defendant manages all aspects related to the operation of its properties.

29.     A number of these properties include assisted living facilities. Fairspring Apartments (hereinafter, "Fairspring") is one such facility.

30.     Fairspring provides affordable housing services to seniors.  A large number of the residents suffer from physical and mental impairments associated with advanced age.

31.     In 2015, Defendant acquired Fairspring and several other apartments owned by Waterford Group Properties, LLC.  Defendant is in charge of managing these properties. Defendant has implemented its own policies regarding their operation.

32.     Defendant's apartment complexes are maintained and overseen by an overlapping hierarchy of employees.

33.     Defendant employs regional managers to oversee the work of the general building staff.  This includes the work of property managers.

34.     Defendant hired Plaintiff and other similarly situated employees to perform work as property managers.

35.     Plaintiff was hired by Julie Palmeri (hereinafter, "Palmeri"), who is Defendant's compliance and project manager.

36.     Palmeri told Plaintiff that she would receive an hourly rate for all work performed.

37.    Plaintiff and Palmeri agreed that Plaintiff's hourly rate would be twenty dollars ($20.00) per hour.

38.    Plaintiff received this rate for the duration of her employment.

39.    Plaintiff's duties centered on handling resident complaints.  Resolving disputes between residents was part of this task.

40.    Plaintiff's task also consisted of compiling and filing various documents.

41.    Plaintiff had a variety of general responsibilities as well, which included general maintenance and inspections.

42.    Plaintiff began her day by checking her voicemail. She would then return the calls of prospective tenants, also known as "leads."

43.    Plaintiff would also return the calls of current tenants.  Many of these calls dealt with maintenance requests.

44.    Plaintiff was required fill out work orders specific to each maintenance request. Plaintiff would then give the work orders to maintenance staff.  Maintenance personnel were the persons responsible for completing the work orders.

45.    Plaintiff was only tasked with handing out the work orders to maintenance staff. Plaintiff was not responsible for overseeing maintenance personnel.

46.    Palmeri and other management officials were the persons responsible for overseeing the maintenance staff.  This includes inspecting the work they performed.

47.    Plaintiff had no decision-making authority regarding the maintenance staffs' employment.

48.    Plaintiff had to report any maintenance concerns directly to a supervisor.  She lacked the discretion to act on her own.

49.     Plaintiff did not have the authority to alter the work orders.  She also had no say regarding the manner in which they were assigned.

50.     Plaintiff had to fill out and distribute the work orders exactly how she was told. These procedures were aligned with Defendant's strict protocols.  Plaintiff could not modify these protocols.

51.     Plaintiff was also responsible for handling resident complaints.  There were persistent issues involving the elderly residents.  They often could not get along with one another.

52.     The residents were constantly bickering.  Plaintiff had to assist in the resolution of their disputes.  This had the effect of continuously interrupting Plaintiff's work schedule. Given the advanced age of the residents, resolving their disputes could take a substantial amount of time.

53.     Plaintiff had no say regarding the manner in which these disputes were resolved. There were specific procedures Plaintiff had to follow.  These procedures were implemented by Defendant.   Defendant demanded Plaintiff to follow these procedures precisely.

54.     If Plaintiff was unable to resolve a particular dispute in accordance with company protocol, she was to seek assistance from a supervisor.  Palmeri or another management official would ultimately decide how to handle the dispute.  Plaintiff had no input regarding this decision.

55.     Plaintiff's duties also consisted of having to schedule appointments with prospective tenants.  She had to meet with them as well.  These meetings consisted of providing prospective residents with information regarding the property.  This included when units would become available and Defendant's rates.

56.     Plaintiff had no discretion regarding these rates.  Plaintiff could not alter the rates in any way.  She was not authorized to negotiate the rates on Defendant's behalf.  Any requests to modify a rate had to be brought to a supervisor's attention.

57.     Plaintiff was also responsible for showing the apartments to prospective tenants. Having to complete this task in conjunction with her regular assignments often extended Plaintiff's workday.  She would often show the property six (6) or seven (7) times a day.[3]

58.     Plaintiff had no say regarding which units were shown.  She had no say regarding when potential tenants could move in.  These decisions were made by Defendant.  Plaintiff was not involved with these decisions.

59.     Filing, compiling and organizing various documents was another component of Plaintiff's duties.  These documents were in connection with Defendant's recertification process.

60.     Plaintiff was required to facilitate this process, which entailed gathering the information needed to renew a tenant's lease.

61.     Plaintiff had to collect a resident's bank statements, pension paperwork and other personal documentation.  DSS information and statements of gross income were also secured.

62.     To obtain these documents, Plaintiff had to schedule a face to face interview with each tenant.  These interviews were scheduled once a year.

63.     The recertification process was very time-consuming.  As the tenants were elderly, it was common for their memories to be lacking.  Tracking the residents down to start the process was an additional hurdle.

64.     Once Plaintiff was able to obtain the necessary documents, she forwarded this information to third parties.  Third party groups were then responsible for verifying the information submitted.  This consisted of checking a tenant's eligibility based on income and related factors.

65.     If a tenant met all verification requirements, he or she was permitted to sign a new lease.  Whether or not a resident met the requirements was dependent on the documents submitted.

---

[3] Plaintiff was originally promised bonuses based on the number of new leasing agreements she was able to procure.  She never received any bonuses.

66.     The documents Plaintiff submitted on the residents' behalf were required by mandates from government agencies.   Each document was noted on a detailed checklist.

67.     Plaintiff simply had to obtain the documents on the checklist and forward them from there.  She had no involvement with the verification process.  She had no input pertaining to whether tenants fulfilled their requirements.

68.     Defendant was also subject to audits.   The audits primarily involved reviewing a resident's file.  Plaintiff had the additional task of ensuring that all files were properly maintained. She had to make sure that all required documents were filed correctly.

69.     During audit periods, completion of these tasks caused Plaintiff to work even more overtime.  This resulted from the sheer number of documents associated with each resident.  Each document had to be maintained in accordance with established guidelines.  Plaintiff had to follow these guidelines precisely.

70.     Plaintiff was also responsible for building inspections.   She had to ensure that each tenant's unit was in functional order.  She also regularly inspected the facility for leaks, flooding and other damage concerns.

71.     Anytime there was damage, there were specific protocols that Plaintiff had to follow.   If the issue was relatively minor, Plaintiff typically only had to inform maintenance staff.

72.     If there was a major concern, Plaintiff would have to report the problem to a supervisor.  A supervisor would then decide how to be address the problem.  Plaintiff could not make any unilateral decisions on her own.

73.     Plaintiff retained no discretion in the performance of any of her tasks.

74.     Plaintiff's duties did not require any analysis.

75.     Plaintiff never had to interpret any information.

76. Plaintiff's duties did not require an advanced degree.

77. Plaintiff's assignments did not require any specialized intellectual instructions.

78. Plaintiff also could not hire or fire any employees. Only upper management officials had that authority.

79. Plaintiff made no recommendations in regard to hiring or firing.

80. Plaintiff did not have an executive role.

81. Plaintiff did not supervise any of Defendant's employees.

82. Plaintiff's duties were non-managerial in nature.

83. All of Plaintiff's duties were performed at Defendant's explicit direction.

84. Plaintiff satisfied the requirements of her position to benefit Defendant.

85. Plaintiff satisfied the requirements of her position to benefit Defendant's residents.

86. Plaintiff performed her duties to the extent required by Defendant.

87. Plaintiff was hired to work eight (8) hours a day, five (5) days a week.

88. Plaintiff was told that her schedule would be from 9:00 a.m. to 5:30 p.m., Monday through Friday.

89. Plaintiff was also advised that she was to receive a thirty (30) minute break for lunch.

90. According to her schedule, Plaintiff was only supposed to work forty (40) hours each week.

91. Plaintiff always worked hours outside of her schedule.

92. There were many duties specific to Plaintiff's role. The recertification process, handling resident disputes and the general upkeep of the complex were all time-consuming tasks.

The performance of all of these tasks caused Plaintiff to consistently work over forty (40) hours each week.

93.     The combination of all of her assignments caused Plaintiff to work approximately fifty (50) hours each week.

94.     Plaintiff regularly left work long after her shifts were scheduled to end.

95.     It was also common for Plaintiff to have to return to work after her shifts had already ended.  Persistent issues regularly developed that required immediate attention. Plaintiff had no choice but to address these issues.

96.     The nature of Plaintiff's duties caused her to work hours outside of her schedule. Working with older residents posed unique challenges.  Residents were frequently combative and agitated.  Attempting to keep them calm often took longer than expected.  This distracted Plaintiff from the completion of her other duties.

97.     Plaintiff's workload often prevented her from taking a lunch break.  Eating at her desk while continuing to work was a consistent practice.  Oftentimes, even this was impossible.

98.     Residents would come to Plaintiff with complaints at all hours during her workday. This frequently occurred during Plaintiff's lunch period.   Plaintiff was often unable to take a break due to having to address resident concerns.

99.     Understaffing also substantially contributed to Plaintiff having to work through lunch.

100.    Understaffing also caused Plaintiff to have to work hours outside of her schedule.

101.     For the duration of Plaintiff's employment, Fairspring was exceptionally short staffed.

102.    When Plaintiff's employment began, there was an assistant property manager ("assistant") staffed at the facility.  The assistant helped Plaintiff with her duties.

103.    However, the assistant's employment ended after only a month into Plaintiff's tenure.

104.    For the remainder of Plaintiff's employment, there was no one to assist her.

105.    Despite Plaintiff's requests, Defendant failed to hire another assistant property manager.

106.    Because Plaintiff was the only property manager on site, she was responsible for tending to all issues that involved the residents. Plaintiff always had to remain available in order to address their concerns.

107.    Plaintiff received constant phone calls and e-mails from residents.  Various issues arose at all times throughout the day.  This included periods when Plaintiff was not physically present at work.

108.    Plaintiff had to respond to these issues prior to when her shifts began.  This often occurred early in the morning.

109.    Plaintiff would also respond to resident concerns well after the time her shifts had ended.  It was common for Plaintiff to make or return phone calls and send or receive e-mails late in the evening.

110.    As a result of being the only property manager on site, it was common for Plaintiff to have to respond to resident concerns on the weekends.  Working Saturdays and Sundays became a regular practice for Plaintiff.

111. It was also common for residents to bring issues to Plaintiff's attention while she was performing her other duties. Plaintiff had to stop whatever she was doing in order to address the issue.

112. Resident issues often took long periods to resolve. This in turn delayed the completion of her regular assignments. To complete all of her assignments, Plaintiff had to work hours outside of her schedule.

113. Plaintiff alone was responsible for all of the assignments described above. Defendant's failure to hire another assistant property manager impacted Plaintiff's workload immensely.

114. After the assistant manager left, there was no one to assist Plaintiff with returning the calls of prospective tenants.

115. There was no one to assist Plaintiff with scheduling appointments with potential residents.

116. There was no one at the facility other than Plaintiff to meet with prospective tenants.

117. Plaintiff also had no one to help her with showing the property to prospective tenants.

118. There was no one to help Plaintiff with the numerous work orders she had to complete.

119. Plaintiff also had no one to help her with distributing the work orders.

120. There was no one to help Plaintiff with any aspect of the recertification process.

121. Plaintiff herself had to perform all of the face to face meetings with the tenants at the facility.

122. Plaintiff alone had to gather all of the recertification documents.

123. Plaintiff had no one to help her with filing or organizing these documents.

124. Due to not having the help from an assistant property manager, there was no one to assist Plaintiff with performing the daily inspections. This includes assistance with addressing the maintenance issues that followed from those inspections.

125. At times, Plaintiff would not even have assistance from maintenance staff. Due to understaffing, maintenance personnel were often unavailable. Plaintiff was the secondary point of contact when maintenance personnel could not be located. Consequently, she was required to remain on call at all times.

126. This resulted in Plaintiff having to regularly return to work after her shifts had ended. Plaintiff routinely reported back to work in order to repair smoke detectors and other miscellaneous tasks.

127. Addressing these maintenance issues was another factor that caused Plaintiff to work overtime consistently.

128. Plaintiff was never compensated for any overtime hours she worked.

129. Defendant was well aware of the overtime hours worked by Plaintiff.

130. Defendant suffered or permitted Plaintiff to work more than forty (40) hours each week.

131. Defendant knew that Plaintiff had to consistently report to work during periods when she was "on call."

132. Defendant knew that Plaintiff completed work both before and after her scheduled shifts.

133. Defendant knew that Plaintiff regularly performed work on the weekends.

134. Defendant knew that Plaintiff regularly worked through lunch.

135.    Defendant was well aware that Plaintiff was the only property manager staffed at the Fairground facility for the majority of her tenure.

136.    Defendant was aware that understaffing caused Plaintiff to frequently work hours outside of her schedule.

137.    Plaintiff had regular contact with Defendant throughout the course of her employment.  This includes Palmeri, who was Plaintiff's primary supervisor.

138.    Palmeri and other agents of Defendant's were regularly present in Plaintiff's work area.

139.    Palmeri and other agents were frequently present at the facility where Plaintiff's assignments were performed.

140.    Defendant implemented timekeeping software to track Plaintiff's time.

141.    Plaintiff used the software regularly.  She "clocked in" when she arrived to work and "clocked out" at the time she left.

142.    Plaintiff's timesheets clearly show the overtime hours she worked.

143.    The timesheets illustrate that for the duration of her employment, Plaintiff consistently worked in excess of forty (40) hours each week.

144.    Plaintiff's timesheets show that she consistently worked approximately fifty (50) hours each week.  There were times when she worked even more.

145.    Regardless of the number of overtime hours she worked, Defendant refused to compensate Plaintiff for working these hours.

146.    For months, Plaintiff complained to Defendant regarding the excessive overtime she was working.  The complaints were primarily directed at Palmeri.

147.     These complaints did not cause Defendant to alter Plaintiff's schedule, nor provide Plaintiff with additional help.

148.     Plaintiff consistently complained to Palmeri in regard to not being compensated for the overtime hours she worked.

149.     Palmeri responded by stating that it was Defendant's policy to not compensate its employees for overtime.

150.     Plaintiff frequently submitted her timesheets to Palmeri.

151.     Plaintiff also brought to Palmeri's attention the overtime hours that were documented on her timesheets.

152.     Plaintiff made repeated requests to be compensated for these overtime hours worked.

153.     Palmeri ignored Plaintiff's request. Instead, Palmeri would alter Plaintiff's timesheets.

154.     Prior to submitting Plaintiff's timesheets to Defendant's human resources department, Palmeri would change the hours listed on the timesheets to reflect that Plaintiff only worked forty (40) hours.

155.     This was done for the purpose of denying Plaintiff the overtime wages she earned.

156.     Lunch breaks were also unlawfully deducted from Plaintiff's paychecks.

157.     Thirty (30) minute break periods were automatically deducted by Defendant's timekeeping software, regardless of whether or not Plaintiff actually took a break.

158.     Throughout the course of her employment, Plaintiff made clear to Defendant that due to the volume of her assignments, she rarely, if ever was able to take a full lunch break.

159. Plaintiff continuously complained to Defendant regarding the fact that she was denied compensation for lunch breaks that were not taken.

160. Plaintiff explained to Defendant that her lunch breaks were almost always interrupted.

161. Plaintiff constantly complained that working through lunch contributed to the number of overtime hours she worked each week.

162. Defendant failed altogether to compensate Plaintiff for working these additional hours.

163. Plaintiff never received overtime wages at a rate of "time and a half" her regular rate of pay.

164. Regardless of how many hours she worked each week, Plaintiff was only paid for working forty (40) hours or less.

165. There is no bona fide dispute that Plaintiff is owed overtime wages for hours worked over forty (40) in a workweek.

166. The duties performed by Plaintiff did not implicate any exemptions contained within the FLSA, MWHL, or the MWPCL.

167. In bad faith, Defendant withheld the overtime wages owed to Plaintiff, even after she continuously inquired about the wages missing from her paychecks.

168. Plaintiff's inquiries were never answered, leading her to leave Defendant's employ on September 1, 2016.

169. The burden of continuing to work overtime without being compensated became too difficult to handle.[4]

---

[4] Upon information and belief, select employees who performed duties similar to Plaintiff received overtime wages. This same group of employees also received bonuses from Defendant. Plaintiff has asserted that she failed to receive both bonuses and

170.     Consequently, Plaintiff, on behalf of herself and all those similarly situated, seeks the wages to which she is entitled and other available relief through this Complaint.

## FLSA COLLECTIVE ACTION ALLEGATIONS

171.     Plaintiff and other similarly situated employees work or worked as property managers for Defendant.  Their duties were performed at the various properties owned and/or managed by Defendant.

172.     Upon information and belief, all properties owned by Defendant have property managers and are run in a similar manner as the Fairspring facility.

173.     The FLSA requires employers to compensate non-exempt employees such as Plaintiff and others similarly situated overtime wages for all hours worked over forty (40) within a workweek.

174.     Defendant knew that Plaintiff and similarly situated employees typically worked over forty (40) hours per week.

175.     Defendant suffered or permitted Plaintiff and other property managers to work more than forty (40) hours per week.

176.     Defendant knew or should have known that Plaintiff and those similarly situated were entitled to overtime pay for all hours worked over forty (40) in a workweek.

177.     Pursuant to the FLSA, Plaintiff commences this collective action against Defendant on behalf of herself and those similarly situated.

178.     Plaintiff demands damages reflecting an overtime rate of not less than one and a half (1.5) times her regular rate of pay for all hours worked over forty (40) in any workweek within the applicable statute of limitations.

---

overtime wages as a result of her race.  A formal complaint has been lodged with the Equal Employment Opportunity Commission ("EEOC") regarding Defendant's alleged discriminatory practices (MCCR 1611-0758).

179. Plaintiff makes these same demands on behalf of all members of the putative class.

180. Plaintiff consents to be party plaintiff in this matter. Plaintiff's consent form is attached to this Complaint as Exhibit A.

181. It is likely that other individuals will join Plaintiff during the litigation of this matter and file written consents to "opt in" to this collective action.

182. There are numerous similarly situated current and former employees of Defendant that have been harmed by Defendant's common scheme to underpay its employees and violate the FLSA.

183. These similarly situated persons are known to Defendant and are readily identifiable through Defendant's records.

184. Many of these similarly situated employees would benefit from the issuance of court-supervised notice, granting them the opportunity to join this lawsuit.

185. Upon information and belief, others will choose to join Plaintiff in this action against Defendant and opt in to this lawsuit to recover unpaid wages and other available relief.

## CAUSES OF ACTION AND VIOLATIONS OF LAW

### *Count I - Violation of the FLSA: Failure to Pay Overtime Wages to Plaintiff and all Members of the Collective Class Who, During The Course of This Matter, Opt-In to the Suit by Submitting their Consent Forms to Become a Party Plaintiff.*

186. Plaintiff hereby fully incorporates in this Count all allegations contained within Plaintiff's Complaint.

187. Plaintiff is entitled to overtime under 29 U.S.C. § 207(a), which provides that employers must compensate their employees for hours worked in excess of forty (40) in a workweek at a rate of not less than one and one-half (1.5) times the regular rate at which they are employed.

188.    As described above, Plaintiff has not received from Defendant compensation reflecting the prescribed overtime wage rate for hours worked in excess of forty (40) in a workweek; Defendant failed to compensate Plaintiff for these additional hours.

189.    Defendant willfully and intentionally failed to compensate Plaintiff for the overtime wages she is owed.

190.    There is no bona fide dispute that Plaintiff is owed overtime wages for work performed for Defendant.

191.    Under the FLSA, Plaintiff is entitled to additional wages from Defendant to compensate her for the hours she worked in excess of forty (40) in a workweek at a rate of one and one-half (1.5) times her regular hourly wage rate.

### ***Count II.  Violation of MWHL: Failure to Pay Overtime Wages to Plaintiff and all those that are Joined as Party Plaintiff in this Matter by Motion or by Any Other Means Deemed Appropriate by This Honorable Court***

192.    Plaintiff hereby fully incorporates in this Count all allegations contained within Plaintiff's Complaint.

193.    Pursuant to Md. Code Ann., Lab. & Empl. § 3-415, each employer shall pay an overtime wage of at least one and one half (1.5) times the regular hourly rate.

194.    Pursuant to Md. Code Ann., Lab. & Empl. § 3-420(a), an employer shall compute the wage for overtime under Md. Code Ann., Lab. & Empl. § 3-415 on the basis of each hour over forty (40) that an employee works during one (1) workweek.

195.    Plaintiff has not received compensation from Defendant reflecting the prescribed overtime wage rate for hours worked in excess of forty (40) in a week.

196.    Defendant willfully and intentionally did not compensate Plaintiff for the overtime wages she is owed.

197.    There is no bona fide dispute that Plaintiff is owed overtime wages for work performed for Defendant.

198.    Under MWHL, Plaintiff is entitled to additional wages from Defendant for all overtime hours worked at a rate of one and one-half (1.5) times her regular hourly wage rate.

***Count III - Violation of the MWPCL: Failure to Pay Wages Owed at the Termination of Their Employment to Plaintiff and all those that are Joined as Party Plaintiff in this Matter by Motion or by Any Other Means Deemed Appropriate by This Honorable Court.***

199.    Plaintiff hereby fully incorporates in this Count all allegations contained within Plaintiff's Complaint.

200.    Plaintiff is entitled to wages under the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. §§3-501 *et. seq*., which provides that each employer shall pay an employee all wages due for work that the employee performed before the end of employment, on or before the day on which the employee would have otherwise been paid the wages.

201.    Plaintiff has not received compensation from Defendant for all wages owed for work performed before the termination of her employment as required by Md. Code Ann., Lab. & Empl. §3-505(a).  This is specific to Defendant' failure to pay Plaintiff the overtime wages to which she is entitled.

202.    Defendant willfully and intentionally did not compensate Plaintiff for the wages owed to her and continued to violate the MWPCL, even after Plaintiff informed Defendant of the violation.

203.    Under the MWPCL, there is no bona fide dispute that Plaintiff is owed wages for work performed while employed by Defendant.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff on behalf of herself and others similarly situated, prays for the following relief:

a)      In accordance with 29 U.S.C. § 216(b), designation of this action as a collective action on behalf of Plaintiff and those similarly situated;

b)      Ordering Defendant to disclose in computer format, or in print if no computer readable format is available, the names, addresses and emails of all those individuals who are similarly situated and permitting Plaintiff to send notice of this action to all those similarly situated individuals;

c)      Designating the named Plaintiff to act as class representative on behalf of all similarly situated employees for the FLSA collective class;

d)      Judgment against Defendant for their failure to pay Plaintiff and those similarly situated in accordance with the standards set forth by the FLSA;

e)      Judgment against Defendant for their failure to pay Plaintiff and those appropriately joined to this matter in accordance with the standards set forth by MWHL;

f)      Judgment against Defendant for their failure to pay Plaintiff and those appropriately joined to this matter in accordance with the standards set forth by the MWPCL;

g)      Judgment against Defendant and classifying its conduct as willful and not in good faith;

h)      Judgment against Defendant and classifying Plaintiff, the collective class and those appropriately joined in this matter as non-exempt employees entitled to protection under the FLSA, MWHL and the MWPCL;

i)      An award against Defendant for the amount of unpaid overtime wages owed to Plaintiff, those similarly situated and those appropriately joined in this matter, calculated at a rate that is not less than one and a half (1.5) times Plaintiff and other similarly situated employees' regular hourly rate for all overtime hours worked;

j)      An award of liquidated or trebled damages equal to, or double, the total amounts of unpaid wages owed to Plaintiff, those similarly situated and those appropriately joined in this matter, whichever is deemed just and equitable by this Honorable Court;

k)      An award of reasonable attorneys' fees and all costs, plus pre-judgment and post-judgment interest, to be satisfied in full by Defendant;

l)     Leave to add additional plaintiffs to all counts alleged herein by motion, through the filing of written consent forms, or any other method approved by this Honorable Court; and

m)    All further relief deemed just and equitable by this Honorable Court.

## REQUEST FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff requests that a jury of her peers hear and decide all possible claims brought on behalf of Plaintiff and those similarly situated.

Respectfully submitted,


*/s/ Benjamin L. Davis, III*
Benjamin L. Davis III, Esq. (29774)
bdavis@nicholllaw.com
The Law Offices of Peter T. Nicholl
36 South Charles Street, Suite 1700
Baltimore, Maryland 21201
Phone No.: (410) 244-7005
Fax No.:    (410) 244-8454

*Attorneys for Plaintiff*